UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE JOSEPH P. ADDABBO FAMILY HEALTH
CENTER, INC. on behalf and by PETER NELSON,
IN HIS CAPACITY AS CEO AND EX-OFFICIO
MEMBER OF THE BOARD OF DIRECTORS
and SANFORD BERNSTEIN, IN HIS CAPACITY
as TREASURER and MEMBER OF THE BOARD
OF DIRECTORS OF THE BOARD OF DIRECTORS
OF THE JOSEPH P. ADDABBO FAMILY
HEALTH CENTER, INC.

                    Plaintiffs,                                    **COMPLAINT**

         -against-

SYLVESTER OKONKWO, BETTY LEON,
GLENN DIRESTO, DIANNE MOORE, CAMILLE
EADDY, SAYWALAH KESSELLY, CALDINE
REY, HARVEY GORDON, MERRILL WRIGHT,
BISHOP ALONZO BROWN, EACH INDIVIVIDUALLY
AND IN THEIR CAPACITY AS BOARD MEMBERS
OF THE JOSEPH P. ADDABBO FAMILIY HEALTH
CENTER, INC.
                    Defendants.
-------------------------------------------------------------X

CV 12 - 2985

AMON, CH.J.

REYES, M.J

         Plaintiffs, THE JOSEPH P. ADDABBO FAMILY HEALTH CENTER, INC. on

behalf and by PETER NELSON, IN HIS CAPACITY AS CEO AND EX-OFFICIO MEMBER

OF THE BOARD OF DIRECTORS and SANFORD BERNSTEIN, IN HIS CAPACITY as

TREASURER and MEMBER OF THE BOARD OF DIRECTORS OF THE JOSEPH P.

ADDABBO FAMILY HEALTH CENTER, INC., by their attorney, Kristian K. Larsen, Esq., for

their Complaint, upon information and belief allege as follows:

         1.      That at all times hereinafter mentioned the plaintiff, THE JOSEPH P. ADDABBO

FAMILY HEALTH CENTER, INC., was and still is a domestic New York Not-for-Profit

Corporation, authorized to do business, in the State of New York, organized and existing under

and by virtue of the laws of the State of New York.

2.      That at all times hereinafter mentioned plaintiff, THE JOSEPH P. ADDABBO FAMILY HEALTH CENTER, INC., (hereinafter "Addabbo") is a domestic corporation authorized to do business in the State of New York with its principal offices at 6200 Beach Channel Drive, Arverne, New York 11692.

## FEDERAL JURSIDICTION

3.      That this Court has jurisdiction over this matter by virtue 28 USC §1331 due to the fact that Addabbo is a Federally Qualified Health Center and recipient of federal funds, the instant controversy concerns violations by Addabbo's Board of their obligations under the Public Health Service Act and Medicare and Medicaid law to assure that Addabbo is operated in compliance with all applicable Federal, State, and local laws and regulations.

## VENUE

4.      That venue in this Court is proper in that Addabbo's principal offices are located within the Eastern District of New York pursuant to 28 USC §1391.

5.      That at all times hereinafter mentioned the plaintiff, Addabbo, is a Federally Qualified Health Center, (FQHC) and a Not for Profit Corporation, under Art. 7 of New York State N-PCL §706 *et seq.* and §501C(3) of the Internal Revenue Code, was and still is a provider of medical and related services, including but not limited to, preventive medicine, diagnostic testing, treatment of sicknesses and infectious diseases in underserved communities.

6.      That at all times hereinafter mentioned the plaintiff, Addabbo, is the recipient of Section 330 Grants (hereinafter "330 Grants") under the Public Health Service Act (42 USC §254b) as administered by the U.S. Department of Health and Human Services ("HRSA") and is required to comply with 45 CFR Part 74, 42 CFR Part 51c and 42 CFR Parts 56.201-56.604 (collectively, the "Federal Regulations") as well as all Medicare and Medicaid funding laws with respect to all of its facilities.

2

7.      That pursuant the Public Health Service Act, the Medicare and Medicaid funding laws and the applicable Federal Regulations, Addabbo's Board of Directors (the "Board") is required to assure that Addabbo is operated in compliance with all applicable Federal, State, and local laws and regulations.

8.      That plaintiff, PETER NELSON, the Chief Executive Officer ("CEO") and Ex-Officio Board Member of the Board from November of 1997 through the present has a fiduciary duty of care, loyalty and obedience to act in Addabbo's best interests and is acting on behalf of Addabbo by commencing the instant proceeding seeking a Temporary Restraining Order and Injunctive Relief.

9.      That plaintiff, SANFORD BERNSTEIN, ("Sandy") is the present treasurer of Addabbo and a Member of the Board and the Executive Board. In his capacity as treasurer and Board Member, Sandy has a fiduciary duty of care loyalty and obedience to act in Addabbo's best interests and is acting on behalf of Addabbo by commencing the instant proceeding seeking a Temporary Restraining Order and Injunctive Relief.

10.     Here, the Defendant Board of Directors of Addabbo have collectively violated the Public Health Service Act, the Medicare and Medicaid funding laws and the applicable Federal Regulations through the following breaches of their fiduciary duties, their duties of care, loyalty and obedience to act in Addabbo's best interests, their violations of Addabbo's By-Laws and Articles of Organization in addition to committing numerous violations of the Federal and state laws applicable to Addabbo and the Board.

### As For The First Cause of Action

**Aiding and Abetting the Violation of the United States and New York False Claims Acts**

11.     The allegations contained in paragraphs 1 through 10 are re-alleged and incorporated by reference hereto.

3

12.     In or about October/November 2011 an investigation and report into time card fraud was conducted by Addabbo's Corporate Compliance Officer and Addabbo's Corporate Compliance Operations Team which substantiated numerous findings of time card fraud and resulted in the termination for cause of several offending employees.

13.     Despite repeated requests and invitations by Addabbo's CEO and Corporate Compliance Officer to review the findings of the time card fraud investigation and the clear and convincing evidence in support thereof, the Board declined such review any of the investigations findings and willfully ignored and denied its validity as well as the CEO's decision to terminate the offending employees.

14.     Thereafter, several members of the Board met secretly with one of the disgruntled terminated employees, Cecelia Salgado and instead of acting to protect Addabbo's best interests, determined to launch a secret investigation into Addabbo's CEO and management staff on the basis of Ms. Salgado's allegations of misconduct.

15.     At a secret meeting of less than all of the Board Members, several Board Members authorized an investigation into Addabbo's CEO and management staff which was conducted by an independent investigator over several months in violation of Addabbo's By-Laws and internal policies regarding internal investigations as well as fundamental principals of Due Process.

16.     Although neither of the Plaintiffs were never formerly advised of the findings of the investigation into Addabbo's CEO and management staff nor provided with a final investigation report, upon information and belief, the investigation cleared Addabbo's CEO and management staff of wrongdoing.

17.     During the course of the investigation of Addabbo's CEO and management staff, several members of the Board entered into negotiations to re-hire Cecelia Salgado, despite the fact that she was fired for cause for the time card fraud she had committed.

18.     Upon, information and belief, as of the date of this Complaint, the Board continues to negotiate with the Cecelia Salgado in violation of its fiduciary duties, their duties of care, loyalty and obedience to act in Addabbo's best interests by advocating on her behalf in furtherance of her fraudulent conduct against Addabbo.

19.     As a result of the foregoing, the Board has and continues to aid and abet Ms. Salgado in the commission and cover-up of her time card fraud and has thus placed Addabbo in jeopardy of losing its federal funding.

### As For The Second Cause of Action

### Violation of False Statements Relating To Health Care Matters

20.     The allegations contained in paragraphs 1 through 19 are re-alleged and incorporated by reference hereto.

21.     The Board has committed a criminal violation of 18 USC §1035 by ignoring, denying and covering up the time card fraud committed by Ms. Salgado and through its ongoing attempts to negotiate and re-hire Ms. Salgado in furtherance and support of her fraudulent conduct in connection with Addabbo.

22.     As a result of the foregoing, the Board has placed Addabbo in jeopardy of losing its federal funding.

### As For The Third Cause of Action

### Violation of New York Not For Profit Law and Addabbo's By-Laws

23.     The allegations contained in paragraphs 1 through 22 are re-alleged and incorporated by reference hereto.

5

24. On February 29, 2012, the Board illegally conducted elections of the Executive Board of Directors in violation of the New York Not For Profit Law Addabbo's By-Laws and Articles of Incorporation through their willful and bad faith failure: (i) to provide proper notice to elect the proposed slate of Executive Directors in accordance with By-Laws; and additionally (ii) through their bad faith and illegal "election" of the Executive Board of Directors by the vote of a single Board member and not the requisite 51% of a quorum of the Board.

25. As a result of these illegal elections, the current illegally elected "Executive Board" is illegally exercising power and authority for which its does not have legal authority and as a result has wrongfully gained dominion and control over Addabbo and its policies and internal regulations.

26. Moreover, in further violation of the New York Not For Profit Law and Addabbo's By-Laws and its Articles of Incorporation, Members of the illegally elected Executive Board of Directors have used and are attempting to use their illegal positions in a campaign of acts calculated to: (i) strip the CEO of executive powers explicitly granted by the Addabbo's By-Laws and its Articles of Incorporation, including the power to hire or fire; (ii) retroactively enact policies that will result in the wrongful termination of 27.2% of Addabbo's employees; and (iii) retroactively enact policies that will have a significant negative impact on Addabbo's federal funding, its operational capacity and its ability to provide necessary services to the underserved communities it presently serves.

27. As a result of the foregoing, the Board has placed Addabbo in jeopardy of incurring substantial litigation and arbitration costs, significant unemployment expenses, and the loss of millions of dollars in federal funding annually.

### As For The Fourth Cause of Action

**Violation of the Public Health Service Act, the Medicare and Medicaid Funding Laws and the Applicable Federal Regulations**

28.     The allegations contained in paragraphs 1 through 27 are re-alleged and incorporated by reference hereto.

29.     Because the Public Health Service Act, the Medicare and Medicaid funding laws and the applicable Federal Regulations, require Addabbo's Board to assure that the Addabbo is operated in compliance with all applicable Federal, State, and local laws and regulations, the violations of Causes of Action One through Three also constitute violations of the Public Health Service Act, the Medicare and Medicaid funding laws and the applicable Federal Regulations.

WHEREAS, plaintiffs respectfully request this Court to grant the an Order granting the following relief:

(i)     Injunctive relief in the form of an order and permanent injunction enjoining the present Board of Directors from making any decisions, resolutions, and/or holding or calling any matter to vote, including but not limited to the adoption of any protocols related to the hiring or firing of Addabbo executives and/or employees, the negotiating and or entering into any agreements, the adoption of any resolutions restricting and/or usurping the CEO's exclusive hiring and firing authority, and declaring any of the foregoing acts made prior to this order null and void until further order of this Court;

(ii)    Injunctive relief in the form of an order, disbanding the present Board of Directors for the violations of federal and state law alleged in this Complaint;

(iii)   Declaring the February 29, 2012 election of the Executive Board of Directors null and void for the violations of federal and state law alleged in this Complaint;

7

(iv)     Injunctive relief appointing a federal receiver to oversee the Addabbo until a new board of directors is elected in accordance with Addabbo's By-laws and Articles of Incorporation and all applicable federal and state regulations; and

(iv)     Injunctive relief requiring the Board to produce any and all minutes of: (v) all Executive Sessions, (w) Board Meetings conducted without proper advance notice to all Board Members, (x) Board Meetings which excluded the CEO/ex-officio Member of the Board of Directors, (y) Board Meetings which secretly, and in violation of the By-Laws initiated an investigation against the CEO and other senior management, and (z) Board Meetings in which decisions were made without the CEO having been noticed or later informed, during the period from April of 2011 through the present, along with all relevant documents related to (v)-(z) including and not limited to emails, logs, notes, checks and invoices for services rendered in connection therewith, and all related memoranda whether in hard copy or electronic form;

(v)      An award of plaintiffs' reasonable attorneys fees, costs and disbursements in this action; and

(vi)     Such further other relief as this Court deems just and proper.

Dated:  Brooklyn, New York
        June 13, 2012

                                        Respectfully Submitted,

                                        Kristian K. Larsen, Esq. (KL7352)
                                        Attorney for Plaintiffs
                                        Law Offices of Kristian Karl Larsen
                                        23 Seventh Avenue, Suite 1
                                        Brooklyn, NY 11217
                                        Tel: 646-403-9703
                                        Fax: 646-403-9710



# By-Laws

# of

# The Joseph P. Addabbo
# Family Health Center, Inc.

**Ratified July 31, 1986**

**(As amended through May 28, 2008)**

## Joseph P. Addabbo Family Health Center

### By-Laws

### Revised and Adopted May 28, 2008

**Article I:**       **Members**

The Organization will have no members.

**Article II:**       **Organization**

The name of this organization shall be the Joseph P. Addabbo Family Health Center, Inc.

The primary service area of the Joseph P. Addabbo Family Health Center, Inc. will be the Rockaway peninsula, Queens County, State of New York.  The organization may also have other operating sites within the State of New York as the Board of Directors may from time to time determine or the business of the organization may require.

**Article III:**       **Purposes**

With the belief that all citizens are entitled to the highest quality of health and health-related care, the Joseph P. Addabbo Family Health Center's mission is to provide primary family health care services that are of the highest quality and offered in a dignified manner with an emphasis on serving low socio-economic groups.

In pursuit of this goal, the Joseph P. Addabbo Family Health Center is established for the following purposes:

1.    To establish a governing board consistent with Section 33 of the Public Health Services Act (Community Health Centers) as amended by Title V of Public Law 94-63, and Chapter 751 of the New York State Hospital Code (governing authority diagnostic and treatment centers) which shall:

   a.    Establish general policies for the Health Center;
   b.    Approve the Center's annual budget;
   c.    Approve selection of the director for the Health Center;
   d.    Fulfill duties as described in Article IV of these by-laws.

2.    To improve community health standards by:

   a.    Conducting informational campaigns about what health facilities and services are available to residents of the area;

2

b.  Promoting and encouraging the development of new or expanded health services;

c.  Promoting and participating in health planning and development;

d.  Promoting effective municipal, county, state and federal health related services within the area;

e.  Promoting equality of care in all health institutions which serve the Joseph P. Addabbo Family Health Center patients.

3.  To increase community residents' effective use of medical, dental, and psycho-social services by disseminating information to the community about such services.

4.  To ensure that services of the Center meet community needs by promoting and encouraging the employment of qualified adult community residents in all respects of the delivery of health services.

The Joseph P. Addabbo Family Health Center shall be nonpartisan and nonsectarian and shall take no part in or lend its influence or facilities, directly, to the nomination, election, or appointment of any candidate for office or religious movement, or any commercial enterprise.

## **Article IV**:          **Board of Directors**

Section I:          Powers and Duties

The Board of Directors shall have general power to control and manage the affairs and property of the organization subject to applicable law and in accordance with the purposes and limitations set forth in the Certificate of Incorporation herein.

The Board of Directors shall:

1.  Select all officers for the Organization and the members of the Executive Committee.

2.  Adopt policy that establishes the conduct of the Center and ensures that the Center operates in compliance with applicable Federal, State and Local laws and regulations.

3.  Evaluate health center activities including service utilization pattern, productivity of the health center, patient satisfaction, achievement of objectives, and establishment of a process for hearing and resolving patient grievances.

4.  Adopt policy for financial management practices, including a system to assure accountability for the health center's resources, approve the annual budget,

3

health center priorities, eligibility for services including criteria for partial payment schedules and long-range financial planning.

5.    Once a year, evaluate a financial report, verified by the President and Treasurer or a majority of the Directors and certified by an independent public accountant or a firm of such accountants selected by the Board. This report shall be filed with the records of the Organization and a copy or abstract thereof entered in the minutes of the Board.

6.    Adopt health care policies for the Center that includes the scope and availability of services, location and hours of services and quality of care audit procedures.

7.    Approve the by-laws and regulations of the medical staff.

8.    Ensure the establishment of personnel policies and procedures to include selection and dismissal procedures, salary and benefits scales, employee grievance procedures, and equal opportunity practices for all employees.

9.    Set criteria for the selection, evaluation and dismissal of the Executive Director of the health center. The Executive Director shall be selected by a majority vote of the Board of Directors.


Section 2:         Number

The number of Directors constituting the entire Board shall be not less than nine (9) and no more than twenty-five (25) members. Subject to such parameters, the number of Directors may be increased or decreased from time to time, by resolution of the Board of Directors, but such action by the Board shall require a vote of a majority of the entire Board and no decrease shall shorten the term of any incumbent Director.


Section 3:         Election and Term of Office

The initial Directors shall be the persons named in the Certificate of Incorporation. The term of office for all Board members shall be a period of three (3) years. Directors may be elected to any number of consecutive terms. A Board member shall serve until his/her successor has been selected as specified in these by-laws.

Terms shall be staggered with no more than four (4) newly elected directors serving in each year. Directors shall be elected annually to serve full terms as needed.

The members of the Board of Directors shall be selected by a majority vote of the members at the annual meeting; from the slate of applicants prepared by, and submitted by the Nominating Committee.

The provisions contained herein for selection of members of the Board of Directors shall apply to all members of the Board whether or not they are consumers, providers or any other designation. The Board recognizes that it be important that there be a board range of continuity among all Board members.

4

Section 4:          Qualification for Directors

Each Director shall be at least eighteen (18) years of age. A majority of fifty-one percent (51%) of the governing board members must be individuals (consumers) who use the services of the Center as the regular source of health care for themselves and/or their immediate families.

As a group, these Board members must reasonably represent the individuals served by the Center in terms of demographic factors such as race, sex and ethnic origin. The remaining members of the Board should be able to provide technical expertise required to operate the Center, i.e., health care delivery, fiscal law, and should reside, work or have a personal interest in the community in which the Center is located. However, no more than one-half (1/2) of the non-consumer members of the Board may be health professionals or others who derive more than ten percent (10%) of their income from the health care industry.

No member of the Board shall be an employer of the Center or spouse, child, parent, brother or sister by blood or marriage of such an employee.

Section 5:          Removal

Any Board member may be removed at any time for cause by a vote of Directors then in office at a regular meeting or special meeting of the Board called for that purpose; provided that there is a quorum of not less than a majority present at such meeting; and provided further that at least one (1) week's notice of the proposed action have been given to the entire Board of Directors when in office. Cause shall include, but is not limited to, absence without acceptable excuse, as determined by the Chairperson, from three (3) consecutive regular Board meetings and/or committee meetings.

Section 6:          Resignation

Any Director may resign from office at any time. Such resignation shall be made in writing, and shall take effect at the time specified therein, and if no time be specified, at the time of its receipt by the Organization or by the Chairperson. The acceptance of a resignation by the Board of Directors shall not be necessary to make it effective, but no resignation shall discharge any accrued obligation or duty of a Director.

Section 7:          Vacancies and Newly Created Directorships

Any newly created Directorships and any vacancies on the Board may be filled for the unexpired term, on the basis of recommendations from the Nominating Committee, by a vote of the Board members present at any duly constituted meeting. All vacancies shall be filled as soon as possible after notification of the vacancy. Recommendations for individuals to fill vacancies must be in a manner which assures compliance with federal regulations regarding Board composition.

5

<u>Section 8</u>:          Board Selection Process

Candidates for Board membership shall be solicited by the posting of criteria for candidates and directions for completing an application on Health Center bulletin boards and/or other Health Center communications. Postings will occur all year round.

The Nominating Committee will screen all applications to develop a slate consistent with Board composition requirements. The Committee will present and recommend an annual slate of candidates for both Board membership and officer positions to the Board at the annual meeting. The Nominating Committee will be responsible to maintain a file of eligible candidates for Board and committee positions. Once a member is selected, the Nominating Committee will also provide an orientation to new board members.

<u>Section 9</u>:          Meetings

Regular meetings of the Board of Directors shall be held at least once per month. Special meetings of the Board may be held upon the designation of the Chairperson or upon written request of any five (5) Board members. Meetings shall be conducted according to simplified parliamentary procedure based on Robert's Rules of Order. The Chairperson's ruling on a point may be overridden by two-thirds (2/3) vote of those present.

The annual meeting of the organization shall take place during the month of January of each year at such time and place is designated by the Board of Directors. The meeting shall be for the purpose of setting the agenda for the upcoming year, reviewing the program of the previous year and selecting the Directors when vacancies need to be filled.

<u>Section 10</u>:          Notice of Meetings

Regular monthly meetings will be held according to the schedule of meetings set forth by the Board of Directors at the annual meeting. Notice of the time and place of the annual meeting, each regular meeting not fixed by the Board and special meetings must be accompanied by a written agenda setting forth all matters upon which action is proposed to be taken. This notice shall be:

a.      delivered to each Director by email or facsimile at least five (5) days before the day on which the meeting is to be held, or

b.      mailed to each Director, postage prepaid, addressed to him/her at the residence or usual place of business, or at such other address as he or she may have designated in a written request filed with the Secretary at least seven (7) days before the day on which the meeting is to be held.

6

Section 11:          Quorum and Voting

A quorum will be established when fifty percent (50%) of the entire membership is present at meetings.

Unless otherwise provided by law or within these by-laws, the affirmative vote of a majority of Directors present at any regular meeting or Special meeting shall be sufficient for the transaction of any business provided that a quorum has been established.

Each voting member of the Board shall be entitled to one (1) vote on matters before the body for such action. No member may vote by proxy or otherwise than in person.

Section 12:          Compensation

No compensation of any kind shall be paid to any Director for the performance of his or her duties as Director, except that the members serving on the Board shall be reimbursed for transportation cost and other incidental costs to attending Board and Committee meetings, and other such official functions as may be authorized by the Board of Directors.

### Article V:          **Officers, Employees and Agents**

Section 1:          Numbers and Qualifications

The Board officers shall consist of a Chairperson, Vice Chairperson, Secretary, Treasurer and such other Officers, if any, including one or more Vice Chairpersons, as the Board of Directors may from time to time appoint. All officers shall be Directors and shall be entitled to vote.

The Chairperson shall preside at all meetings of the Board and Executive Committee, shall be an ex-officio member of all committees except the Nominating Committee, and shall perform all such duties as are incidental to the officers and are properly required.

Section 2:          Election and Term of Office

All officers shall be elected for a term of two (2) years at the annual meeting of the Board of Directors, and no officer may be elected for more than two (2) consecutive terms for any one office.

Section 3:          Removal

Any officer of the Organization may be removed with or without cause by a vote of the majority of the entire Board of Directors.

7

Section 4:          Vacancies

Any vacancy of an elected officer may be filled for the unexpired term on the basis of recommendations from the Nominating Committee.


Section 5:          Chairperson: Powers and Duties

The Chairperson shall preside at all meetings of the Board of Directors and the Executive Committee. The Chairperson shall have general supervision of the affairs of the Organization and shall keep the Board of Directors fully informed about the activities of the Organization. He or she has the power to sign and execute in the name of the organization all contracts authorized either generally or specifically by the Board. The Chairperson shall be an ex-official member of all committees except the Nominating Committee, and shall perform all such duties as are incidental to the office and are properly required.


Section 6:          First Vice Chairperson: Powers and Duties

The First Vice Chairperson shall, in the absence of the Chairperson, exercise all functions of the Chairperson and shall be vested with all such powers.


Section 7:          Second Vice Chairperson: Powers and Duties

The Second Vice Chairperson shall, in the absence of the Chairperson and the First Vice Chairperson, exercise all functions of the Chairperson and shall be vested with all such powers.


Section 8:          Treasurer: Power and Duties

The Treasurer shall serve as Chairperson of the Finance and Audit Committee and shall submit regular reports of the financial affairs of the Health Center to the Board of Directors. The Treasurer shall keep a record and account of all monies received and expended for the work of the Board of Directors.


Section 9:          Secretary: Powers and Duties

The Secretary shall have charges of all papers, keep such records, make such reports, and performs such duties as are incidental to the office and properly required by the organization. The Secretary with the staff report shall keep accurate minutes of meetings of the Board and Executive Committee meetings, shall be responsible for all correspondence of the Board, and shall keep up to date membership rosters of the Board, and Committee of the Board.

<u>Section 10</u>:          Executive Director: Powers and Duties

The Executive Director shall be the chief administrative officer of the Center, be responsible for the day to day operation of the organization, and shall serve as the full time staff director of the Center, and shall be an ex-officio member of the Board.

The Executive Director shall be delegated the authority to function as the liaison between staff and the governing body.  The Executive Director's duties shall include, but shall not be limited to, the following:

    a.      Contracting for medical services

    b.      Hiring and dismissal of all personnel, including physicians

    c.      Negotiating contracts for services within the guideline established by all regulatory agencies and the Board

    d.      Preparation of budgets for the Center

## <u>Article VI</u>:          **Committees**

<u>Section 1</u>:          Executive Committee

The Executive Committee shall consist of the officers of the Organization including Chairperson of the Board, Vice Chairperson, Secretary and Treasurer plus no more than three (3) other members of the Board of Directors appointed by the Chairperson of the Board who will also serve as Chairperson of the Executive Committee. Membership is subject to the approval of the Board of Directors.

The Executive Committee shall have active control of the conduct of the business of the Organization when the Board of Directors is not in session and shall at each meeting of the Board report its actions for ratification.

The Executive Committee may act on a majority vote of its members and its meetings may be called at any time by the Chairperson, or in his absence, the Vice Chairperson.

Minutes of all Executive Committee meetings shall be kept and available to all Board members for inspection.  These minutes shall report the names of committee members present and absent, and each motion considered and action taken thereupon.

The Executive Committee will be responsible for long range planning and by-laws revisions and/or amendments.

The Executive Committee will be responsible for developing personnel policies for the Center and shall periodically review the personnel policies to ensure conformity with policies and criteria established by the Board and for compliance with regulation by governmental agencies.

9

Section 2:          Finance and Audit Committee

The Finance and Audit Committee shall consist of at least three (3) Directors, one of whom shall be the Treasurer.   The Treasurer shall serve as Chairperson of such committee. The other members of the Finance and Audit Committee shall be appointed by the Chairperson of the Board in consultation with the Treasurer and subject to approval of the Board.

The Committee shall advise the Treasurer and the Board in regard to the investments and general fiscal policy of the Organization. The Committee shall also be responsible for oversight of the Organization's outside auditors and oversight of the Organization's internal fiscal controls and financial reporting.

Monthly financial statements of the Center will be made available for the committee's examination and comment.


Section 3:          Nominating Committee

The Nominating Committee consists of three (3) to seven (7) Board members, including the Chairperson, who shall be appointed by the Chairperson of the Board, with the approval of the Board.   The Committee will be appointed shortly after the annual meeting, to serve until the following annual meeting.

The Nominating Committee will be responsible for developing and maintaining a file of eligible candidates for Board and Committee positions, preparing annual slates of consumer and community at large nominees for Board positions, recommending an annual slate of officers to the board and recommending replacements for elective vacancies.


Section 4:          Quality Assurance Committee

The Quality Assurance Committee will be responsible for reviewing the availability, accessibility and scope of services offered by the Center. The Committee will review recommendations of quality assurance activities such as program reviews.   The Committee shall make recommendations for improvements in all areas of programs when appropriate. The Quality Assurance Committee will be chaired by the Medical Director.   The Committee must also maintain membership of at least one (1) Board member at all times.


Section 5:          Other Committees

There may be other standing or ad hoc committees as the Board may from time to time determine, the members of which shall be appointed by the Chairperson upon approval by the Board.

**Article VII**:        **Indemnification and Insurance**

<u>Section 1</u>:          Indemnification

The Organization shall, to the fullest extent now or hereafter permitted by law, indemnify any person made, or threatened to be made, a party to any action or proceeding by reason of the fact that he or she or his or her testator was a Director, officer, employee or agent of the Organization, against judgments, fines, amounts paid in settlement and reasonable expenses, including attorney fees.  No indemnification shall be made to or on behalf of any such person if:

> a.    His or her acts were committed in bad faith or were the result of his or her active and deliberate dishonesty and were material to such action or proceeding, or,

> b.    He or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

<u>Section 2</u>:          Insurance

The Organization shall have the power to purchase and maintain insurance to indemnify the Organization for any obligations which it incurs as a result of its indemnification of Directors, officers, and employees pursuant to Section 1 above, or to indemnify such persons in instances in which they may be indemnified pursuant to Section 1 above.

**Article VIII**:        **Conflict of Interest**

Any Board member having an interest in a contract or other transaction presented to members of the Board of Directors or a committee thereof for authorization, approval or ratification, shall give prompt, full and frank disclosure of his/her interest to the Board of Directors prior to the Board acting on such contract or transaction.  The body to which such disclosure is made shall determine in closed session by majority vote, whether the disclosure shows that a conflict of interest exists or can be reasonably construed to exist.  If a conflict is deemed to exist, such person must absent him/herself from the area where the discussions of deliberations with respect to such contract or transactions are being conducted.   In addition, such person shall not vote on, nor use his/her personal influence on Board members.  However, such person may be called upon to present factual information or to respond to questions to the reviewing body.   In addition, should a Board member feel that another Board member who has not made a disclosure might possibly have a conflict, it is her/his responsibility to bring this to the attention of the Board.  Such person may be counted in determining the existence of a quorum at any meeting where the contract or transaction is under discussion or being voted upon.  The minutes of the meeting shall reflect the disclosure, the vote thereon, the abstention from voting and participation, and whether the quorum was present.

11

### Article IX:          Non-Discrimination

In all of its dealings, neither the Organization nor its duly authorized agents shall discriminate against any individual or group for reason of race, color, creed, sex, age, ethnicity, national origin, marital status, sexual preference, mental or physical disability, or any category protected by law.

### Article X:          Amendment of By-Laws

These by-laws may be amended by a two-thirds (2/3) vote of the membership present and voting, at any regular or special meeting of the Board of Directors, provided a copy of the proposed amendment(s) has been sent to each voting member at least two (2) weeks prior to being voted upon.   Any member shall have the right to offer by-law changes.

### Article XI:          Adoption of By-Laws

These by-laws shall be effective immediately upon adoption by two-thirds (2/3) of the membership of the Board of Directors present and voting, at any regular scheduled meeting of the Board of Directors.

Reviewed, Revised and Adopted:                    May 28, 2008

J.R. Peter Nelson, Ph. D.                          Miguel A. Jiménez
Executive Director                                 Chairperson, Board of Directors
Joseph P. Addabbo Family Health Center             Joseph P. Addabbo Family Health Clr.

cs

12

*[handwritten: Policy should be going forward, not backward]*

*[handwritten: 3]*

# EMPLOYMENT OF RELATIVES

*[handwritten in left margin: Redbook / Both]*

No immediate relative of any Senior Manager of the Joseph P. Addabbo Family Health Center (the "Center") may work for the Center in any capacity, including without limitation as an employee, consultant or contractor. For purposes of this policy, Center Senior Manager shall include the following positions, and any other positions deemed by the Center's Board of Directors to be a Senior Manager: Executive Director, Medical Director, Chief Operating Officer, Compliance Officer, Director of Human Resources, Chief Financial Officer, Chief Information Officer, and/or any Department Manager. Similarly, no immediate relative of any Center Senior Manager may be assigned to work at the Center by a provider of contracted services. Except as otherwise indicated in this policy, effective August 31, 2012, the employment or engagement of any immediate relative of any Center Senior Manager who is employed or engaged in any capacity by the Center or by a provider of contracted services will be terminated.

No immediate relative of any person who is not a Center Senior Manager but who holds a managerial or supervisory position with the Center may work for the Center in any capacity, including without limitation as an employee, consultant or contractor, where s/he will report, either directly or indirectly, to such person who holds a managerial or supervisory position with the Center. In the event that such a supervisory relationship exists, the Center will attempt to transfer one of the two affected persons to a position where s/he will not have a reporting relationship to his/her immediate relative; if it is not possible to transfer one of the affected persons, the Center will determine which of the two individuals will be required to terminate his/her employment or engagement with the Center.

Immediate relative is defined as the child, step-child, spouse, domestic partner, parent, guardian, brother, sister, grandparent, grandchild, aunt, uncle, or cousin of any employee, consultant or contractor of the Center, or any person with whom the employee, consultant or contractor of the Center has a romantic or close personal relationship.

*[handwritten left margin: Review with attorney]*

This policy shall not apply to any individual hired or engaged by the Center who has been expressly advised in writing by the Chair of the Center's Board, on behalf of the Board, that s/he and his/her respective relative may work at the Center.

*[handwritten right margin: By whose rule]*

*[handwritten: Policy is unfair based on discrimination against relatives — disparate impact on Blacks, asians, Latinos]*

*[handwritten: This policy retaliates against senior managers who brought forward info and which recommended termination of Cecilia.]*

## JR Peter Nelson PhD.

| | |
|---|---|
| **To:** | Sylvester Okonkwo; Sanford Bernstein; Alfonzo Brown; Glenn DiResto; Camille Eaddy; Harvey Gordon; Saywalah Kesselly; Betty Leon; Dianne Moore; Caldine Rey; Brother Tom; Miguel Jimenez; Maria Gonzalez |
| **Cc:** | SCostin@hrsa.gov; Michael Taubin, Esq. |
| **Subject:** | Impact Study on New Board Policy on Employment of Relatives |

To Mr. Sylvester Okonkwo and Members of the Board:

The policy on employment of relatives defines an immediate relative as someone who has a direct blood relationship to another person, a close personal relationship or a romantic relationship. The policy states that no immediate relative of any senior or departmental manager will be able to continue to be employed at Addabbo past August 31, 2012.

The Human Resources Dept. has provided me with the following information: Addabbo employs 320 persons; 78 are related to one another by definition of this policy. 31 are managers; the 31 managers are immediately related to 47 other employees. My impact analysis is based on 47 staff being terminated in August.

A financial analysis reveals an immediate impact in the first four years as being $4,973,541. This financial impact analysis took into consideration the cost of rehiring 47 people, the cost of Addabbo paying for their unemployment (we are self-insured), their severance, and vacation or personal holidays. Additionally, due to the loss of critical employees, Addabbo would lose in the first year another $540,000 of Meaningful Use money which we could not access. In the next four years, an additional $2,160,000 would be lost from Meaningful Use monies that would not be accessible. The total amounts to $4,973,541.

Addabbo could anticipate numerous expenses from lawsuits from non-union staff, and arbitrations from union staff. It is difficult to calculate the full cost of this but would be in the millions of dollars.

The human cost to Addabbo and its morale is incalculable. Needless to say, to pursue a retroactive policy which will fire people because they are related to a manager is severe. These are employees who have served Addabbo faithfully or else they would have been previously terminated. They are persons who have been in the position to be recommended or they simply had the availability of knowledge of openings at Addabbo, and advanced themselves forward for jobs for which they were qualified. This is called networking, and is the way most jobs are filled as a result of knowing someone who can recommend you and simultaneously knowing of the availability of a job. For years, we have been told to give preference to people in the community. Our managers and staff often bring to me the names of people in the community who they believe will serve Addabbo well. All of them are subsequently vetted by HR for their qualifications for the job for which they are applying. There are often multiple interviews with other candidates and the best candidates rise to the top. I can say to the Board in unvarnished terms that a retroactive policy of this nature, affecting even a dozen people, will be viewed as an immoral and cruel policy bringing down on good employees' heads a judgment which they do not deserve, and in an economy that is difficult at best to find a new job. A far more sensible policy would be try to create something going forward.

Mr. Okonkwo requested that I give the Policy Committee and the Board the names of all of the proposed persons who are managers and/or are related to other persons. He requested private information which I am unable to divulge due to the ethics of the National Society of Human Resources which states that personnel files are only accessible by managers or supervisors of the particular employee and the HR Dept. I have given you collated data for this reason. However, attached are the names and titles of staff who would be targeted by this new retroactive policy and the managers.

At the Board Meeting of May 30, 2012, Mr. Okonkwo asked me as CEO of the Joseph P. Addabbo Family Health Center (Addabbo) not to have any contact with Board members of the Organization, excepting through him, the Chairman of

the Board. At the same meeting of May 30th, he instructed Board members not to have any contact with the CEO except through himself. In this action, Mr. Okonkwo exceeded his authority and impeded the legitimate rights of all of us, as Board members, to have free, transparent and open dialogue as directed by our inner judgment and conscience. Mr. Okonkwo seems to often forget that in addition to being CEO, I am a legitimate ex-officio member of the Board, without vote. Federal regulations promote this and NYS laws governing not-for-profit organizations encourages the Duty of Care which demand that all Board members, using every means accessible, to obtain full information on issues prior to voting. I don't believe all information filtering through one person qualifies for meeting this Duty of Care which we all have. I continue to be concerned that the attempt to muzzle me and to prevent other members of the Board to hear directly from me is a continuation of a retaliatory spirit which has been active since I fired Cecilia Salgado and others in exercising my responsibility as CEO. I reported these firings and the surrounding causes to the Board on Oct. 19, 2011. Since that time, I have been under investigation and my authority as CEO has been under continuous assault. I would remind the Board and Mr. Okonkwo that I reported all these actions to the Attorney General of the State of NY and the Attorney General of the U.S. As a standing employee, reporting suspected wrongdoing, I am entitled to Whistleblower status and the protections of the Sarbanes Oxley Act of 2002 (107, P.L. 204, Title XI, Section 1107 which applies to non-profit organizations. "It is a crime to knowingly retaliate, including interfering with the lawful employment or livelihood, against any person for providing truthful information to a law enforcement officer relating the commission or possible commission of a federal offense, punishable by fine and up to 10 years imprisonment."

I would caution the Board and its members in taking actions without thorough knowledge which could lead to wrongdoing resulting in one not being covered by the Directors and Officers liability insurance. I encourage you to be careful and thoughtful.

I consider the attempt to limit my access to Board members or of them to me to be infringement upon my authority as a Board member, my duty to communicate with other Board members, and to the status of my lawful employment as CEO of Addabbo. It is a denial of my status as ex-officio member of the Board. I consider it mean-spirited and retaliatory. I also assert that the Chairman of the Board has no weight of authority to direct or compel the members of the Board to the silence of their voices and their efforts to receive the best information to lead this organization. Therefore, in consideration of the above, I do not intend to limit my communication with Board, nor do I expect them to limit their communication with me as this directive has no basis in law or truth. I truly mean no disrespect to the office or the person of the Chairman; I simply believe I must state the facts as I see them.

Respectfully,

J.R. Peter Nelson, PhD, CEO
Joseph P. Addabbo Family Health Center, Inc.
6200 Beach Channel Drive
Arverne, NY 11692



# Joseph P. Addabbo Family Health Center

## Board of Directors Meeting Agenda

## February 29, 2012

### Chairperson's Report:

1. Call meeting to order:
2. Review and accept the minutes from December 7, 2011 Board of Directors meeting.
3. Review and accept the minutes from January 25, 2011 Board of Directors meeting.
4. Report from the Investigating Committee on the CEO and Senior Staff.
5. Complaint to the Board from Mr. Sanford Bernstein.
6. Update on Hiring of Legal Advisor for the Board.

### Executive Director's Report:

1. Complaint to the Board on email of Mr. Kesselly.
2. UDS Health Center Trend Report 2011
3. CDT Update

### Medical Director's Report:

1. Medical Staff Appointment/Re-Appointment presentation.
2. Review minutes from the February 28, 2011 Quality Assurance Committee Meeting.

### Fiscal Director's Report:

1. Presentation of Financial Statements.

## JOSEPH P. ADDABBO FAMILY HEALTH CENTER, Inc.
### Board of Directors Meeting
### Wednesday, February 29, 2012

### MINUTES

**Attendance:**       **Board of Directors**

| | | |
|---|---|---|
| Miguel A. Jimenez - Chair | Saywalah Kesselly – Member | Alfonzo Brown- Member |
| Sylvester Okonkwo -  1st V- Chair | Glenn DiResto – Member | Merrill Wright - Member |
| Betty Leon – 2nd V- Chair | Caldine Rey - Member | |
| Sanford Bernstein - Treasurer | Harvey Gordon - Member | |
| Dianne Moore – Secretary | Camille Eaddy - Member | |

**Attendance:**       **Staff**

J.R. Peter Nelson – Executive Director          Robert Fliegel – Chief Financial Officer

Alfonso Chan – Medical Director          Jinpin Ying – Chief Information Officer

Charity Abdi – Corporate Compliance Office, Co-Director of Human Resource

Sandra Fogg – Chief Operating Officer, Co-Director of Human Resource

**Chairman's Report:** Meeting was called to order at 5:47 p.m. by the Presiding Chairman Mr. Miguel a. Jimenez.

1.  **Agenda was presented by Chair for discussion.**

First, Betty Leon and Saywalah Kesselly noticed that the slate of candidates for executive board elections was absent from the agenda and insisted that said item be included on the agenda.

Second, there were some contentions with respect to the order of business regarding the numerical placement of complaints by both Mr. Sanford Bernstein and Dr. J.R. Peter Nelson. After extensive debate, the body agreed to hear the complaints before the elections and other board issues.

2.  **Review of December 7, 2011 Minutes**

During a discussion of the minutes, Betty Leon wanted the minutes to reflect that although she made two requests to be provided the schedule of Compliance meetings for the purposes of attending, she was informed by Dr. Nelson that these meetings were operational, and that she wanted to know why.

The Chairman requested a motion to accept the minutes with the aforementioned reflections and corrections. Sylvester Okonkwo moved and Saywalsh Kesselly seconded, and the December minutes were adopted.

### 3. Review of the January 25, 2012 Minutes

Dr. Nelson took issue with how the Board minutes were been recorded. He was of the view that individual opinions were being recorded as though they were the consensus decisions of the Board. He cited as an example, the Executive Board's decision to interview a second candidate for corporate counsel, which he described as an opinion of Mr. Okonkwo. Mr. Okonkwo reiterated that the decision was in fact the conclusion reached at the Executive Board's meeting.

The Chairman again, entertained a motion to accept the January 25, 2012 Minutes. Saywalah Keselly moved and Sylvester Okonkow seconded, and the motion carried.

4. **Investigation Report:** Chairman Jimenez informed the body that the Report of the investigation of allegations against Dr. J.R. Peter Nelson was completed and needed to be reviewed by the entire Board membership.

Mr. DiResto informed the body that the 16 page Report was reviewed by the Special Investigation Committee in the presence of investigative Attorney Ms. Deborah Shapiro. He also informed the Chair that no copies of the report were distributed pending the hiring of new Attorney to guide the Board on how to proceed with the matter moving forward. Majority of the Board members agreed to meet on Thursday, March 8, 2012 at 6:00 p.m. to peruse the document.

5. **Complaints from Sanford Bernstein and Dr. J.R. Peter Nelson against Saywalah Kesselly – See Attached:** Chairman Jimenez opened the floor for discussion. Sylvester Okonkwo moved and Saywalah Kesselly seconded the Board go into Executive session. Both Mr. Bernstein and Dr. Nelson objected on the ground that their complaints also impact the executive staff especially senior staff members. After a spirited debate, the body voted 8 to 4 in favor of an executive session.

A. Mr. Sanford Bernstein's Compliants - Mr. Bernstein presented a three page written complaint against Mr. Saywalah Kesselly with backups of email documentations. He charged Mr. Kesselly with "character assassination," making "false allegations," a sinister act of intimidation intended to silience my (his) voice," and "a damaging act of libel." He then placed a motion before the Board to summarily remove Mr. Kesselly by secret ballots from the Board. This motion was seconded by Mr. Glenn DeRisto.

Amongst Mr. Bernstein's complaints were the following:
1. "perennial violator of ...Federal Compliance Requirements and Addabbo's Bylaws
2. "Connivance to usurp the authority of the Comptroller"
3. "the signing of large checks that are questionable and without backups"
4. Actions that may "border on criminality"
5. Clandestine conspiracy to bring new board members during pending investigation

After Mr. Bernstein's presentation, Chairman Jimenez called for a discussion of Mr. Bernstein's complaints to be followed by a vote.

At this juncture, Mr. Kesselly insisted that he was entitled to "due process." He argued that if Mr. Bernstein wanted his complaint discussed at this meeting (Feb 25, 2011 Board meeting), he should have served him (Mr. Kesselly) and members of the Board copies of his document prior to the meeting. Consequently, Mr. Kesselly requested time and the opportunity to peruse Mr. Bernstein's compliant and to respond to it in kind before any actions are taken on the issue.

Ms. Betty Leon intervened and asserted that Mr. Kesselly deserved an opportunity to respond to the charges leveled against him before any proceedings to vote on his remover. Mr. Harvey Gordon suggested a separate meeting to discuss the allegations. He also motioned that Dr. Nelson read his statement and forward copies to the Board members by Friday, March 2, 2012. Board unanimously voted for Thursday, March 15, 2012 at 6:00 p.m., for the hearings.

B. Dr. J.R. Peter Nelson's complaints – During his presentation, Dr. Nelson spoke of double standards in that Mr. Kesselly was being given copies of the allegations against him; whereas, he (Dr. Nelson) was never given a copy of the allegations against him. He further stated that "Mr. Kesselly's quote crosses the line and meets all New York State Standards for defamation in the workplace," violation of "Addabbo's Ethical Standards," and "imprudent outbursts." As a result, Dr. Nelson concluded, "The Board has a duty to uphold our ethical standards, to avoid risks of law breaking, and to avoid the creating of a hostile workplace environment by its members." He cited the same litany of issues raised in Mr. Bernstein's complaints.

6. **Slate and Elections of the Executive Officers of Addabbo's Board of Directors**
   The Chairperson of the Nominating Committee, Mrs. Caldine Rey presented the following slate of candidates:
   1. Sylvester Okonkwo – Chairman
   2. Betty Leon – 1st Vice Chair
   3. Glenn DeRisto – 2nd Vice Chairman
   4. Stanford Bernstein, Saywalah Kesselly - Treasurer
   5. Vacant - Secretary

There was a question mark to Mr. Sanford Bernstein's name given that Chairperson Caldine Rey was not certain as to the expiration date of his tenure as Treasurer. Ms. Leon asked Mr. Bernstein when exactly he became Treasurer of the Board. Mr. Bernstein responded that he was serving his second term. Based on Mr. Bernstein's assertion, the Treasurer position was removed from the slate. Betty Leon then nominated Saywalah Kesselly for the position of Secretary, and the nomination was seconded by Dianne Moore. Given that there were no opposing candidates to the slate, Dianne Moore, former Secretary of the Board cast the lone vote and the slate was elected by acclamation.

Chairman Jimenez entertained a motion to adjourn, a motion was made by Saywalah Kesselly and seconded by Betty Leon, and the meeting was adjourned at 8:25 p.m.   Submitted: S. Kesselly

*[handwritten: Du Urgency of need Board appointment]*

**JR Peter Nelson PhD.**

| | |
|---|---|
| **From:** | Costin, Sarah  (HRSA) <SCostin@hrsa.gov> |
| **Sent:** | Wednesday, June 06, 2012 4:05 PM |
| **To:** | jrpnelson@addabbo.org |
| **Subject:** | FW: Request: Appropriate Board Representation Update and Board TA Dates |

Dr. Nelson,

I believe this is the email that I sent to you previously.

Best,

**Sarah Costin**
Bureau of Primary Health Care
Northeast Division/Atlantic Branch
Phone: 212.264.2708
Fax: 212.264.2673

---

**From:** Costin, Sarah (HRSA)
**Sent:** Friday, April 27, 2012 4:16 PM
**To:** jrpnelson@addabbo.org
**Subject:** Request: Appropriate Board Representation Update and Board TA Dates
**Importance:** High

Dr. Nelson,

As you know, I have been tracking the status of Addabbo's efforts to attain adequate representation of the Red Hook service area on the Board since the time that the CIS request to add the site to scope was approved on 4/29/2011. It is expected that Addabbo's Board is actively working to recruit a member from that area to ensure that the communities being served are adequately represented on the Board, per HRSA requirements (PIN 1998-12: http://bphc.hrsa.gov/policiesregulations/policies/pdfs/pin199812.pdf): "Section 330(j)(3)(H) stipulates that, in order to receive a health center grant, the applicant must demonstrate that...the center has established a governing body which is composed of individuals, a majority of whom are being served by the center and who, as a group, represent the individuals being served by the center."

Health Center Program grantees must comply with all applicable statutory and regulatory requirements, and it is the goal of the HRSA to support grantees in successfully demonstrating compliance with these requirements. As such, I have been tracking Addabbo's progress on getting a fully representative Board established as a "Performance Improvement Area", rather than an issue of non-compliance, during the time that Addabbo is ramping up operations at the Red Hook site. However, if this becomes on ongoing non-compliance issue, a condition will have to be added to Addabbo's grant award, and a response will be required to be submitted following HRSA's Progressive Action policy, PAL 2010-01 (http://bphc.hrsa.gov/policiesregulations/policies/pdfs/pal201001.pdf).

Without diving too far into the details, you should note the following implications for non-compliance from PAL 2010-01:

> "The Progressive Action process provides a uniform structure and a time-phased approach for notifying grantees of compliance issues and for receiving grantee responses to an identified condition(s). **A grantee's ability to demonstrate compliance with program requirements is critical to ensuring continued grant support.** Therefore, conditions in Phase Two will notify the grantee that failure to respond appropriately to the compliance issue within the applicable 60 day time period may result in the disapproval of future health center

1

grant applications. Failure to adequately address a condition within the Phase Two (60 day) time period will result in a new NGA with a condition specifying a final opportunity to respond within 30 days (Phase Three) and notify the grantee that failure to adequately address the requirement within the ensuing 30 days will result in the disapproval of future health center grant applications."

Lastly, I want to remind you that when the CIS request to add the Red Hook site to scope was submitted, the request indicated that a) the Board approved of the submission of the CIS request and b) Addabbo would comply with program requirements and ensure adequate representation on the Board of the new service area:

*2a. The Board has approved the change in scope to:
A. The Board has approved the change in scope.   [X] Yes [_] No
*2b. If a site to be added or relocated has a different service area and/or target population than those already being served, board representation will be modif patients of the added or relocated site.
[X] Yes [_] No [_] Not Applicable

**Technical Assistance:**
The PIN cited above also mentions the fact that HRSA is committed to assisting grantees in meeting all Health Center Program requirements through the provision of appropriate guidance and technical assistance. A HRSA-sponsored technical assistance site visit is necessary in this case to ensure that Addabbo (staff and Board) is working toward meeting all governance-related program requirements and to provide an overall training. I am requesting that you connect with Addabbo's Board to find a date for a Board training site visit. We will have a one day training and technical assistance session and if further TA is needed, we will schedule that in the future. It is essential that all Board members and staff are aware of the responsibilities that they hold in ensuring compliance with HRSA program requirements.

At your earliest convenience, please provide me with 1) an update on the status of recruitment of a Board member from the Red Hook service area with a clear timeline for when a new Board member will be in place, and 2) at least one date when all members of the Board will be available for a governance TA site visit. If you have any questions or concerns, please do not hesitate to let me know.

Thank you,

Sarah

**Sarah Costin, MIA**
**Public Health Analyst**
United States Department of Health and Human Services
Health Resources and Services Administration
Bureau of Primary Health Care
Northeast Division • Atlantic Branch
26 Federal Plaza • Room 3337 • New York, NY 10278
Phone: 212.264.2708 • Fax: 212.264.2673
scostin@hrsa.gov

 Please print responsibly.

2

**Jr P Nelson**

| | |
|---|---|
| **From:** | Anitra Montgomery [amontgomery@addabbo.org] |
| **Sent:** | Monday, February 27, 2012 2:51 PM |
| **To:** | 'Peter Nelson' |
| **Subject:** | FW: To All Addabbo Board Members |

**From:** Saywalah Kesselly [mailto:saywalah@yahoo.com]
**Sent:** Saturday, February 18, 2012 2:45 AM
**To:** Sanford Bernstein; amontgomery@addabbo.org" ; "nypdblue4u79@aol.com" <nypdblue4u79@aol.com>; "harveygordon49@gmail.com" <harveygordon49@gmail.com>; "majm39@verizon.net" <majm39@verizon.net>; "saywalah@yahoo.com" <saywalah@yahoo.com>; "sokonkwo@aol.com" <sokonkwo@aol.com>; "balvlw@aol.com" <balvlw@aol.com>; "caldinerey@yahoo.com" <caldinerey@yahoo.com>; "p44doll@aol.com" <p44doll@aol.com>; "twopersons630@aol.com" <twopersons630@aol.com>; "cookie340@juno.com" <cookie340@juno.com>
**Cc:** "jrpnelson@addabbo.org"
**Subject:** Re: To All Addabbo Board Members

Fellow Board Members:

This will be my third so-called "Annual Meeting" since I joined the Addabbo's Board and I have never seen this level of hysteria, pettiness, panic attack, and dis-ingenuousness. Let us get to the point.

I read with keen interest both Dr. Peter Nelson and Sanford Bernstein's emails to members of the Board apprising us of the Federal Compliance Requirements for filling Board positions and the By-law stipulations regarding same. Here again are my observations:

Find it interesting how Dr. Nelson and Mr. Bernstein chose to selectively site and interpret certain sections of the By-laws regarding Board member selection and completely left out ours. For example, Article IV: Section 8 states: - Board Selection Process:

"Candidates for Board membership shall be solicited by the posting of criteria for candidates and directions for completing an application on Health Center bulletin boards and/or other Health Center communications. Postings will occur all year round."

Firstly, I have attended virtually every Board meeting for last year and this year, and have never seen any notices posted or brought to the attention of the Board. I have inquired from five Board members, and none has seen or heard of any such notice as stipulated in Article IV: Section 8. If this process is in fact opened, then every Board member should be allowed to recommend potential members.

Secondly, Article IV: Section 7 says that "All vacancies shall be filled as soon as possible after notification of the vacancy." For the past three years, Maria Gonzalez's name has been on the Board's roster but she has never attended any meeting during this period although the term of her leave of absence has long expired. Both Kevin O'Mealy and Tom Trager have been absent from the Board over a year now but their names are still on the roster. During two consecutive meetings, I requested for an updated roster of active Board members; I have yet to receive it. So, why the urgency now?

Dr. Nelson speaks of Federal Compliance, and Mr. Bernstein talks about how his analysis of the issues

ot "intended to embarrass or disparage any member of the Board, but rather as an illustration that misunderstanding, ignorance and/or disagreement s of the bylaws and disputes between members is preventing the Board from diligently executing it's governance responsibilities."

How can these two individuals who are perennial violators of the very Federal Compliance Requirements and Addabbo's Bylaws be the ones pointing fingers at others. A 30% nepotism in Addabbo's workforce, connivance to usurp the authority of the Controller, the signing of large checks that are questionable and without backups are certainly not in compliance with Federal Compliance Requirements or are they? In fact, they may border on criminality.

Finally, should it really come as a surprise to any reasonable mind that clandestinely Chairman Jimenez, Dr. Nelson and Mr. Bernstein are frantically attempting to bring new members on the Board at the time when there is a pending investigation and scheduled elections for new core of officers? The answer is a resounding no! Maybe some of us are ignorant or maybe innocent, but we certainly are not stupid.

Saywalah Kessely

Ps: I hope Mr. Bernstein will find the time to check my spellings and grammar – good luck!

---

**From:** Sanford Bernstein <SMB@rockawave.com>
**To:** "amontgomery@addabbo.org" <amontgomery@addabbo.org>; "nypdblue4u79@aol.com"
<nypdblue4u79@aol.com>; "harveygordon49@gmail.com" <harveygordon49@gmail.com>;
"majm39@verizon.net" <majm39@verizon.net>; "saywalah@yahoo.com" <saywalah@yahoo.com>;
"sokonkwo@aol.com" <sokonkwo@aol.com>; "balvlw@aol.com" <balvlw@aol.com>; "caldinerey@yahoo.com"
<caldinerey@yahoo.com>; "p44doll@aol.com" <p44doll@aol.com>; "twopersons630@aol.com"
<twopersons630@aol.com>; "cookie340@juno.com" <cookie340@juno.com>
**Cc:** "jrpnelson@addabbo.org" <jrpnelson@addabbo.org>
**Sent:** Thursday, February 16, 2012 8:43 PM
**Subject:** To All Addabbo Board Members

Dear Mr. Chairmen and members of the Board,

The purpose of this correspondence is to address some of the issues raised by Mr. Kessely and Ms. Leon in recent emails to the board and respectfully state my arguments in opposition to some of their statements and assertions.

In regards to Mr. Kessely's email of 2/16/2012 12:56 pm, allow me first to suggest that there may be valid reasons for expeditious action by the Board without evoking the hyperbole of world destruction. I will argue this point further later on.

With regard to para (1) of Mr. Kessely's emai, and para (1) of Ms. Leons email of 2/16/12 12:43 pm the duties and responsibilities of the nominating committee are set forth in Article IV, Section 7 and Section 8 and in Article VI, Section 3 of the Bylaws. Repeated below for reference:

Article IV Section 7: Vacancies and Newly Created Directorships
Any newly created Directorships and any vacancies on the Board may be filled for the unexpired term, on the basis of recommendations from the Nominating Committee, by a vote of the Board members present at any duly constituted meeting. All vacancies shall be filled as soon as possible after notification of the vacancy. Recommendations for individuals to fill vacancies must be in a manner which assures compliance with federal regulations regarding Board composition.



**Joseph P. Addabbo**
*Family Health Center*

6200 Beach Channel Drive, Arverne, NY 11692          1288 Central Avenue, Far Rockaway, NY 11691
114-39/49 Sutphin Boulevard, Jamaica, NY 11434          118-11 Guy Brewer Boulevard, Jamaica, NY 11434
120 Richards Street, Brooklyn, NY 11231

Telephone: (718) 945-7150          Fax: (718) 945-2596          Website: www.addabbo.org

## MEMORANDUM

TO:          Dr. Peter Nelson, CEO
             Dr. Alfonso Yu Chan, Medical Director
             Ms. Sandra Fogg, Chief Operating Officer/HR Director

FROM:        Charity Abdi, Corporate Compliance Officer

DATE:        October 13, 2011

RE:          Investigation of Alleged Falsification of Timecard Records

### I. Summary
This report describes the results of a Human Resources/Corporate Compliance
Investigation into the suspicion of falsification of timecards by multiple employees in the
organization. The list of implicated employees includes:

- Zandra Myers/Government Relations
- Wanda Pruitt/HR Coordinator
- Cecilia Salgado/Executive Assistant
- Shellon Harris/Billing Clerk
- Frederico Dingcong/Bookkeeper
- Ireneo Mamba/Billing Clerk

#### A. Factual overview
On September 1, 2011, Dr. Nelson expressed concern about irregularities in Ms. Zandra
Myers ("Myers") accounting for her work hours for Monday, August 29, 2011. Dr.
Nelson commented that while routinely reviewing Myers timecard for payroll submission,
he noted that Myers had a punch in/out on her timecard for August 29th (punch in
8:44am/ punch out 5:07). Dr. Nelson noted that Myers had submitted a request for
reimbursement for $200 stipend inclusive of August 29th for having worked under the
Ready Rockaway grant during the same hours. Myers is the CEO of the Ready
Rockaway program focused on emergency preparedness for the Rockaway Peninsula.
Ready Rockaway is a separate entity from Addabbo. Myers works part time in this
capacity with Addabbo functioning as the pass through agency for payment. Myers
Ready Rockaway submission documented that she had stayed at a hotel working for
Ready Rockaway during the hurricane on 8/26-8/29. Records submitted by Myers
showed Myers checking out of a hotel on August 29th at 10:07 am. Dr. Nelson
commented that Myers could not report to the office to work for Addabbo starting at 8:44

am and check out of a hotel on the same date at 10:07am. Dr. Nelson suspected that Myers might be falsifying her timecard to get paid for both jobs on the same day. Dr. Nelson also suspected other employees were involved in helping her to punch in/out her card when Myers was not in the office.

### B. Investigation Process

As a result of the suspicions, an investigation ensued. Dr. Nelson questioned Myers about her timecard for that date. Myers denied punching her card and stated someone else must have punched her card by mistake. She had not reported the punch before submitting her timecard for payment for that payroll period.

Dr. Nelson asked me to review Myers timecard for the period of August 22-September 2nd. I also reviewed timecards of other staff on the floor who had punched in at the same date and same time as Ms. Myers (timecard reviewed: Wanda Pruitt, Cecilia Salgado, Shellon Harris, Dholakia Shashi).

The timecards reviewed all had punch in and punch within 0-4 minutes of each other. I then reviewed camera footage of the time clock to determine who had punched Myers timecard on August 29th and to determine if there was a pattern of other irregular punches that could be established. I reviewed timecards for the period of August 22-29 for administration staff on the third floor of site 1 (and other staff with timecards in close proximity to Myers timecard). I also reviewed (with Ms. Sandra Fogg and Marlarm security technicians Salvatore D'Agostino and Edward Collins) camera footage near the third floor time clock for dates of that week based on the times punched in and out on Myers card.

Security cameras and timecards of third floor staff were reviewed for the week of Oct.3-7 in order to establish if there were any further dates of concern or ongoing patterns.

### II. Factual Findings

#### A. Facts

Review of security camera footage and timecards showed that Ms. Myers was not present at the time clock during the punch in/out times shown on her card for the dates of August 22, 24, 25 and 29. She was also not present at the time clock when her card was punched the morning of the 23rd. Myers was observed on camera punching out on the 23rd and punched in/out on the 26th. Myers was observed on the 26th punching a second time card in and around 8:35am.

Review of security camera footage and timecards for Pruitt showed that her punch in time on her timecard did not correspond to the time she was observed at the time clock. The time at the time clock fit identical to the times Myers card was punched in or out when Myers was not present. This was the case for the dates of the 22, 23 (morning), 24, 25

and 29th. There were no other timecards punched at that time. This confirmed the suspicion that Pruitt was punching Myers timecard for her.

Review of security camera footage showed Salgado punching two time cards in the morning on the 22, 23, 24, 25 and 29th. Card times and security footage confirm that the two cards punched were Salgado's and Pruitt's.

Shellon Harris also had a punch in on her timecard for August 29th but was not observed by camera at the time clock.

Review of security camera footage and timecards for October 5, showed Frederico Dingcong punching the time clock two times. The punch in times corresponded to the time cards of Dingcong and Ireneo Mamba. Mamba was seen by camera down the hallway two minutes later which confirmed that he was present. He did not approach the time clock to punch in his own time card.

### B. Analysis

The investigation showed that:

1) Myers has been falsifying her timecard by having another employee (Pruitt) punch in/out her timecard at hours of the day when she is in fact not at work. This pattern of falsification is evidenced for the week of august 22-29.

2) Security cameras confirm that Pruitt is the employee assisting Myers in committing the fraud on the organization. Pruitt assisted by punching Myers timecard. Myers also punched in Pruitt on 26th, which Pruitt was not aware of resulting in a double punch on Pruitt's timecard for that morning. Pruitt blacked out this portion of her timecard to cover it up.

3) Myers and Pruitt are not the only employees violating the company's policy on timekeeping records. Ms. Cecilia Salgado assisted Pruitt by punching Pruitt's timecard when punching her own during the dates reviewed in August.

4) Pruitt punched in Shellon Harris on the 29th. Harris arrival time that day has not been established. She was not present at the time clock during the punch in time.

5) Mr. Frederico Dingcong was witnessed as punching the time clock twice on October 5th. Once for himself and a second time for Ireneo Mamba.

### C. Policy

The Joseph P. Addabbo Family Health Center is a federally funded community health center whose 330 grant monies support operations to provide primary care services to the underserved populations of Queens and Brooklyn.

One of the legal benefits afforded a health center with FQHC status is the application of a cost based reimbursement mechanism for visits billed to the New York State Medicaid program and Medicaid Managed Care companies.

Through these federal and state funding mechanisms, the Center uses taxpayer money to pay for the salaries of administrative and clinical staff. It is the Center's responsibility as recipients of federal and state funding to ensure that salaries paid for with government funds reflects a true, accurate and complete accounting through the timekeeping and payroll system.

As such, employees of the Center are informed prior and during employment that any tampering with the timekeeping system such as falsifying punch in/out times or punching a timecard of another employee will constitute a critical offense under the Center's employment policy and result in immediate termination. The Center does not make exceptions to the application of immediate termination for critical offenses of this nature that involves fraud and dishonesty. Falsification of timecards directly relates to dishonesty and misconduct in our payroll accounting, therefore, employees found violating this policy are summarily dismissed without accounting of their intent in adjusting the timecard. The Center's policy shows a clear commitment to moral and ethical conduct. We do not and will not accept non-compliance with standards of accounting for government dollars. This would be in direct contradiction with our responsibilities to DHHS and to the public. Furthermore, it would circumvent the compliance program.

The policy in the Center handbook states that "failure to properly record time may affect the employees pay, result in disciplinary action for violation or both….. NO EMPLOYEE IS TO PUNCH THE CLOCK OR FILL OUT A TIMECARD FOR ANOTHER EMPLOYEE. To do so will result in the offending employee's immediate and summary discharge for having committed a critical offense."

These policies are furthermore enforced to respond to the organizations legal responsibility under the Fair Labor Standards Act to maintain accurate payroll records including accurate records of time worked.

All security camera footage and timecard evidence is available for review. There are some dates of footage that were irretrievable because of erasure of those dates in the system. Dates of infractions were eye witnessed by myself, Sandra Fogg, COO, Salvatore D'Agostino and Edward Collins (Marlarm security technicians).

This kind of violation is considered a critical offense of the Center policy with the recommendation of termination of employment.

## III. Conclusion

I conclude that Zandra Myers, Wanda Pruitt, Cecilia Salgado and Frederico Dingcong all have falsified timekeeping records by punching in or out improperly for themselves or another and have therefore failed to properly record time in violation of the policy. I also conclude that Shellon Harris and Ireneo Mamba have had their cards punched in for them by another employee even if they were onsite at the time of the punch, which also violates company policy.



## JOSEPH P. ADDABBO FAMILY HEALTH CENTER, INC.

### RESPONDING TO DETECTED OFFENSES AND DEVELOPING APPROPRIATE CORRECTIVE ACTION POLICY AND PROCEDURE

**POLICY:** The purpose of this policy is to set forth the procedures used by the Center to respond to information received by the Compliance Officer that a board member, officer, employee, consultant or vendor is engaging in activity that may be contrary to applicable Federal or State law or the requirements of the Center's compliance program.

**PROCEDURE:**

1. **Investigation:**

   A. **Purpose of Investigation**

   The purpose of an investigation is to identify situations in which applicable Federal and state laws, including the laws, regulations and standards of the Medicare and Medicaid programs or the requirements of the Center's compliance program may not have been followed, to identify individuals who may have knowingly or inadvertently violated the law or the Center's compliance program requirements, to facilitate the correction of any violations or misconduct, to implement procedures necessary to ensure future compliance, to protect the Center in the event of civil or criminal enforcement actions, and to preserve and protect the Center's assets.

   B. **Control of Investigations**

   All reports of alleged non-compliance must be forwarded to the Center's Compliance Officer. Investigations should be conducted under the direction of the Compliance Officer. If the involvement of outside legal counsel is warranted, the Compliance Officer will be responsible for requesting that legal counsel 1) initiate an investigation of the conduct in question, 2) prepare a report of findings to the Compliance Officer and 3) recommend the appropriate actions to be taken by the Compliance Officer.

   The Board of Directors may also have direct involvement in requesting an independent investigation when the allegations concern the CEO.

   C. **Investigative Process**

   Upon receipt of information concerning alleged misconduct, the Compliance Officer will, at minimum, take the following actions:

   1. Complete a Compliance Report Form that includes, if known, the name of the employee who made a report, the date of the report, and a detailed narrative of the employee's concern. Anonymity of the

individual who made the report (if requested) and confidentiality will be maintained.

2. Notify the Executive Director of that nature of the alleged improper conduct and, if the involvement of outside legal counsel is warranted, obtain a memorandum from senior management authorizing legal counsel to initiate investigation.

3. Ensure that the investigation is initiated as soon as reasonably possible but in any event not more then three (3) business days following receipt of the information. The investigation shall include, as applicable, but need not be limited to:

   a. Interviews of all persons who may have knowledge of the alleged conduct and a review of the applicable laws, regulations and standards to determine whether or not a violation has occurred.

   b. Identification and review of relevant documentation, including, where applicable, representative bills or claims submitted to the Medicare/Medicaid programs, to determine the specific nature and scope of the violation and its frequency, duration and potential financial magnitude.

   c. Interviews of persons who appeared to play a role in the suspected activity or conduct. The purpose of the interviews is to determine the facts surrounding the conduct and may include but shall not be limited to:

      i.    The person's understanding of the applicable laws, rules and standards;

      ii.   Identification of relevant supervisors or managers;

      iii.  Training that the person received;

      iv.   The extent to which the person may have acted knowingly or with reckless disregard or intentional indifference of applicable laws;

   d. Preparation of a summary report that (1) defines the nature of the alleged misconduct, (2) summarizes the investigation process, (3) identifies any person who is believed to have acted deliberately or with reckless or intentional indifference of applicable laws, (4) assesses the nature and extent of potential civil or criminal liability, and (5) where applicable, estimates the extent on any resulting overpayment by the government.

4. Establish a due date for the summary report or otherwise ensure that the investigation is completed in a reasonable and timely fashion and that the appropriate disciplinary or corrective action is taken, if warranted.

part and that these concerns are most appropriately handled through this procedure.

5. After receipt of the complaint, the Compliance Officer will then conduct an investigation into the allegations to determine the nature, scope and duration of wrongdoing, if any, and shall follow steps set forth in the Policy and Procedure on Responding to Detected Offenses and Corrective Action.

6. Concerns may be resolved through the initial inquiry by agreed action without need for further investigation. If, however, the charges are substantiated, then the Compliance Officer will develop a plan for corrective action and will notify the Compliance Committee and/or the Board of Directors.

7. The amount of contact between the reporter and the Corporate Compliance Officer will depend on the nature of the issue and the clarity of information provided.

8. The reporter, if known, will be given the opportunity to receive follow-up on his or her concern within three weeks. This follow up includes acknowledgement that the concern was received, indication as to how the matter will be dealt with, and an estimate of the time that it will take for a final response. Subject to legal restraints or what is determined to be in the best interest of the Center, the reporter may also receive information about the outcome of the investigation.

9. Concerns expressed anonymously will be investigated, but consideration will be given to the seriousness of the issue raised, the credibility of the concern and the likelihood of confirming the allegation from documentation and/or other sources.

10. Retaliation, harassment, reprisals and victimization of anyone who makes a report of wrongdoing, cooperates in an investigation, or participates in the compliance program is strictly prohibited. If an employer, contractor or volunteer believes that an adverse action in the form of a reprisal or retaliation has been taken against him or her as the result of making a report or cooperating with an investigation pursuant to this or any other compliance policy, he or she should report it to the Compliance Officer.

11. The Compliance Officer shall maintain a confidential log in a secure place of all reports of compliance concerns and shall update the Board of Directors four (4) times a year.

12. The safeguards in this policy do not apply to anyone who would intentionally report a matter that is untruthful, malicious, erroneous or harassing that could damage the mission, integrity and moral of the Center.

13. Anyone who makes a report of wrongdoing maliciously, frivolously or in bad faith will be subject to disciplinary action up to and including termination.

14. The Center seeks to investigate all non-frivolous claims of wrongdoing internally so that corrective action can be instituted. The Center encourages the reporting to the Corporate Compliance Officer so that appropriate corrective action can be instituted. However, any person who discovers wrongdoing that is a false claim or statement may report the information to the Department of Justice or the U.S. Attorney by filing a complaint under seal in the court pursuant to the False Claims Act.

Last Updated: 09/25/2007

## 2. Organizational Response
### A. Non-Compliance/Suspected Criminal Activity

In the event the investigation identifies employee misconduct or suspected criminal activity, the Center will undertake the following steps.

1. The Center will, as quickly as possible, cease the offending practice. If the conduct involves the improper submission of claims for payment, the Center will immediately cease all billing potentially affected by the offending practice.
2. When necessary, the Center will consult with outside legal counsel to determine whether voluntary reporting of the identified misconduct to the appropriate governmental authority is warranted.
3. If applicable, the Center will calculate and repay any duplicate or improper payments made by a Federal or state government program as a result of the misconduct.
4. Initiate appropriate disciplinary action, which may include, but is not limited to, reprimand, demotion, suspension and/or termination. If the investigation uncovers what appears to be criminal conduct on the part of an employee, appropriate disciplinary action against the employee or employees who authorized, engaged in or otherwise participated in the offending practice will include, at a minimum, the removal of the person from any position of oversight and may include, in addition, suspension, demotion, and termination.
5. Promptly undertake appropriate training and education to prevent a recurrence of the misconduct.
6. Conduct a review of applicable health center policies and procedures to determine whether revisions or the development of new policies and/or procedures are needed to minimize future risk of non-compliance.
7. Conduct, as appropriate, follow-up monitoring and auditing to ensure effective resolution of the offending practice.
8. Report findings to the Board of Directors on a quarterly basis as part of the Compliance report or more frequently when warranted.

Last updated 05/15/2007

*Attach or send at 15*
*Senior Management*
**Joseph P. Addabbo** *letter 3/28/12*
*Family Health Center* *Meeting of 15 Board*

6200 Beach Channel Drive, Arverne, NY 11692
114-39/49 Sutphin Boulevard, Jamaica, NY 11434
120 Richards Street, Brooklyn, NY 11231

1288 Central Avenue, Far Rockaway, NY 11691
118-11 Guy Brewer Boulevard, Jamaica, NY 11434

**Telephone:** (718) 945-7150          **Fax:** (718) 945-2596          **Website:** www.addabbo.org

We, the Senior Management Team of the Joseph P. Addabbo Family Health Center, Inc. respectfully submit this letter to the Board of Directors to address the following:

Most recently, key members of this Team have been subjected to a protracted character attack imputing their professional reputations. This Senior Management Team understands the Board's responsibility to ensure legal and ethical integrity and maintain accountability. We further understand the Board's obligation to investigate good faith credible allegations concerning the health center. Our concern is that in the guise of providing these oversight duties these responsibilities have been abused.

This Team is a high quality, vetted professional staff of individuals whose work has, for 15 years under the leadership of Dr. J.R. Peter Nelson and Dr. Alfonso Yu Chan, propelled the health center to great success. Our accomplishments are well documented through both state and federal oversight agency indicators. Our management relationship with staff has never been stronger; as evidenced by the attached letter from 1199 attesting to the application of fairness and due process at Addabbo. We are leaders in our field in developing and implementing cutting edge IT infrastructure to support patient care. Our financial health has never been more robust.

It is therefore quite disconcerting, that despite our many accomplishments and the enormous success of this organization, that the tone of certain Board members inquiry into our work and operations has become accusatory and negative. This tone has imputed our good will and at times been unlawfully defamatory in nature. It has focused on personal attacks on individuals to question their professional credibility rather then substantive evaluation of their work and the Center's operations. It has tried to undermine the authority of a solid management/staff relationship. This tone has expressed distrust and lack of confidence without justification. Unfortunately, it has been tolerated by many of you.

If the Center's performance was failing we could understand the lack of confidence and negative feedback. Some Board members do not even present substantive evidence to support questioning our credibility. The Center is thriving when many other community health centers are faltering. There is no evidence presented to merit the character attacks that have been taking place. Would it not, therefore, be prudent to treat the management team who has led the Center to this level of success with greater respect? It places into question the motivations of any individual Board member's desire to impute our good will and intent? The Board is held to maintain a professional level of courtesy, respect and objectivity in all the organizations activities. They are to exercise power invested for the good of the health center rather than for his or her personal benefit or that of any organization or company they represent. What is there to gain in alienating strong dedicated staff? What is to be gained by undermining our leadership and good relationship with our staff?

During the week of January 2 through the 6th several employees of the health center were contacted by Board Member, Ms. Betty Leon, acting on behalf of the Investigatory Committee and told that they were being requested to participate in secret meetings concerning an investigation. Employees were not informed as to whether they were the subject of such investigation or witnesses for an investigation. Furthermore, the instruction to employees to keep such meeting secret created a disruption to center operations as it ill afforded supervisors and the Senior Management Team the ability to assess

coverage at various sites. It also undermined the reporting relationship of staff to supervisors in that staff felt that they were instructed to maintain secrecy about their whereabouts during work hours.

The Senior Management Team places high value on the necessity for confidential communications during investigations. We do not, however, understand the value for secrecy in the investigatory process especially concerning the subject of allegations and the scheduling of meetings with the center staff to review such allegations.

During these recent months, we have been subjected to an internal investigation that was initially defined to senior management as an investigation of good faith allegations from an anonymous whistleblower. As the investigation has proceeded it has become readily apparent that the source of these allegations was neither anonymous, nor brought in good faith and did not even meet the minimal standards necessary to merit the characterization of whistleblower under federal or state law.

Our ongoing concern is whether the Board, in its investigatory process, has been afforded the opportunity to review the source of such allegations, engages in a procedure of due process and transparency for the subject individual of such allegations, and investigates in a manner with minimal disruption to Center operations.

The danger we fear is the allowance of a "witch hunt" type of investigation that can lose sight of the original allegations in an attempt to find anything damaging for the sake of maligning another's professional reputation.

Upon reflection of the complaint presented today, Senior Management must see some changes in the tone of the Board resulting in the following requests:

1. Greater civility in the tone of Board/management relations. The continued imputing of our reputation will only serve to undermine the great accomplishments of this Center.

2. Discontinue the character attacks on dedicated, long term, highly experienced employees whose performance has garnered numerous advances for our Center. The criticism of individual staff and the tone imputing our good will has diminished our contributions. The criticisms are not supported by fact. Furthermore, statements which impute bad faith and professional reputation are unlawfully defamatory, bullying in nature and not in line with the spirit that has been fostered for the betterment of this community organization.

>An example is the most recent attack email from Mr. Kessely in which he accuses Dr. Nelson and Sandy Bernstein and indirectly implicates our CFO, Robert Fliegel; Mr. Jimenez, Board Chairperson, Dr. Alfonso Yu Chan, Medical Director and our financial auditors of preparing checks without proper backup without any evidence to substantiate such accusation.

3. Speedy resolution to the investigation of Senior Staff Management followed by a comprehensive summary from the Board indicating the allegations, providing a review of the findings and when appropriate exonerating all staff of any alleged individual wrongdoing.

4. Good faith partnership in evaluating Center policy and procedure and implementing revisions as necessary to better strengthen our operations.

5. Careful review and drafting of a policy and procedure on how the Board intends to conduct investigations concerning the CEO.

Such procedure must include that: A) allegations be in writing B) criteria to determine credibility of informant and make proper determinations as to what level of Board response is necessary C) determinations who should have access to the investigatory process throughout the process, D) application of legal standards of due process requiring that accused individuals are informed of the allegations against them and have an opportunity to respond. F) standard for scheduling inquiry so that such investigation does not undermine the organization's ability to exercise authority over staff work hours and patient care.

6. Mandatory disciplinary action of Board members who fail to adhere to the Board Member Code of Ethics.

7. Written response to this communication addressing all topics discussed above.

8. Enter this letter into the meeting minutes.

We work hard for our community and this Center. We work in partnership with you to establish standards of operations and care that make you proud to serve as Board Members. We have all due respect for the Center's Board. We look forward to restoring the collegial relationship that has always existed between the Board and Management until recently. We continue to proudly work in collaboration with the Board in fulfilling our respective duties and corporate mission for the community we serve at Addabbo.

Signed:

Dr. J.R. Peter Nelson, CEO
Dr. Alfonso Yu Chan, Medical Director
Robert Fliegel, CPA Chief Financial Officer
Sandra Fogg, Chief Operating Officer
Jinpin Ying, PhD, Chief Information Officer
Charity Abdi, Esq., Corporate Compliance Officer



# Joseph P. Addabbo
### Family Health Center

6200 Beach Channel Drive, Arverne, NY 11692          1288 Central Avenue, Far Rockaway, NY 11691
114-39/49 Sutphin Boulevard, Jamaica, NY 11434          118-11 Guy Brewer Boulevard, Jamaica, NY 11434

**Telephone:** (718) 945-7150          **Fax:** (718) 945-2596          **Website:** www.addabbo.org

TO:          J.R Peter Nelson, Ph.D.

FROM:          Sylvester Okonkwo, Chairperson- Board of Directors

DATE:          April 17, 2012

SUBJECT:          Health Center Investigation

As you are aware, a complaint was recently raised by a former employee of the Joseph P. Addabbo Family Health Center (the "Center"). The Board of Directors of the Center (the "Board") engaged an experienced neutral outside investigator, who conducted a thorough investigation that consisted of interviews of the complaining party, you, and numerous employees of the Center. The investigator has concluded her investigation, and the Board is determining what actions to take. In the interim, I am instructing you, on behalf of the board, as follows:

1.  You are strictly warned that the Center and its Board will not tolerate any form of retaliation against Cecilia Salgado for having raised the complaint, or against any other employee of the Center for participating in the investigation of such complaint. Retaliation includes, but is not limited to, treating any person differently than s/he was treated before the investigation; treating any person differently than other similarly-situated employees because s/he participated in the investigation of the complaint; ostracizing in any way any person because s/he participated in the investigation of the complaint; speaking negatively about any person because s/he participated in the investigation of the complaint; and/or interrogating any person about any aspect of the investigation. Retaliation is considered a very serious offense, and any retaliation by you will result in your immediate termination from employment.

2.  You must maintain the confidentiality of the complaint and all information learned or disclosed during the investigation, and should not discuss the complaint or the investigation with anyone other than the Board

3.  Until further notice, the Center may not, unless expressly authorized in writing by the Chairperson of the Board: (a) hire or engage any administrative staff (i.e., non-clinical staff) or consultants at annualized salaries or remuneration of $50,000 or more, or (b) grant raises or bonuses to any Center employee, and/or increase the compensation of any consultant.

You are required to sign below to acknowledge your receipt and understanding of this memorandum.

I have read and understand the above memorandum.

_____          _____
J.R. Peter Nelson, Ph.D.                                             Date